**MENDEZ et al. v. WESTMINISTER
SCHOOL DIST. OF ORANGE
COUNTY et al.**

Civil Action No. 4292.

District Court, S. D. California,
Central Division.

Feb. 18, 1946.

David C. Marcus, of Los Angeles, Cal., for petitioner.

Joel E. Ogle, Co. Counsel, and George F. Holden, Deputy Co. Counsel, both of Santa Ana, Cal., for respondents.

A. L. Wirin and J. B. Tietz, both of Los Angeles, Cal., for American Civil Liberties Union, amicus curiae.

Chas. F. Christopher, Ben Margolis, and Loren Miller, all of Los Angeles, Cal., for National Lawyers Guild, amicus curiae.

McCORMICK, District Judge.

Gonzalo Mendez, William Guzman, Frank Palomino, Thomas Estrada and Lorenzo Ramirez, as citizens of the United States, and on behalf of their minor children, and as they allege in the petition, on behalf of "some 5000" persons similarly affected, all of Mexican or Latin descent, have filed a class suit pursuant to Rule 23 of Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, against the Westminister, Garden Grove and El Modeno School Districts, and the Santa Ana City Schools, all of Orange County, California, and the respective trustees and superintendents of said school districts.

The complaint, grounded upon the Fourteenth Amendment to the Constitution of the United States[1] and Subdivision 14 of Section 24 of the Judicial Code, Title 28, Section 41, subdivision 14, U.S.C.A.,[2] alleges a concerted policy and design of class discrimination against "persons of Mexican or Latin descent or extraction" of elementary school age by the defendant school agencies in the conduct and operation of public schools of said districts, resulting in the denial of the equal protection of the laws to such class of persons among which are the petitioning school children.

Specifically, plaintiffs allege:

"That for several years last past respondents have and do now in furtherance and in execution of their common plan, design and purpose within their respective Systems and Districts, have by their regulation, custom and usage and in execution thereof adopted and declared: That all children or persons of Mexican or Latin descent or extraction, though Citizens of the United States of America, shall be, have been and are now excluded from attending, using, enjoying and receiving the benefits of the education, health and recreation facilities of certain schools within their respective Districts and Systems but that said children are now and have been segregated and required to and must attend and use certain schools in said Districts and Systems reserved for and attended solely and exclusively by children and persons of Mexican and Latin descent, while such other schools are maintained, attended and used exclusively by and for persons and children purportedly known as White or Anglo-Saxon children.

"That in execution of said rules and regulations, each, every and all the foregoing children are compelled and required to and must attend and use the schools in said respective Districts reserved for and attended solely and exclusively by children of Mexican and Latin descent and are forbidden, barred and excluded from attending any other school in said District or System solely for the reason that said children or child are of Mexican or Latin descent."

The petitioners demand that the alleged rules, regulations, customs and usages be adjudged void and unconstitutional and that an injunction issue restraining further

---

[1] "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[2] "The district courts shall have original jurisdiction as follows: * * *"

Sec. 41, subd. (14) "Suits to redress deprivation of civil rights. Fourteenth. Of all suits at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."

application by defendant school authorities of such rules, regulations, customs, and usages.

It is conceded by all parties that there is no question of race discrimination in this action. It is, however, admitted that segregation per se is practiced in the above-mentioned school districts as the Spanish-speaking children enter school life and as they advance through the grades in the respective school districts. It is also admitted by the defendants that the petitioning children are qualified to attend the public schools in the respective districts of their residences.

In the Westminister, Garden Grove and El Modeno school districts the respective boards of trustees had taken official action, declaring that there be no segregation of pupils on a racial basis but that non-English-speaking children (which group, excepting as to a small number of pupils, was made up entirely of children of Mexican ancestry or descent), be required to attend schools designated by the boards separate and apart from English-speaking pupils; that such group should attend such schools until they had acquired some proficiency in the English language.

The petitioners contend that such official action evinces a covert attempt by the school authorities in such school districts to produce an arbitrary discrimination against school children of Mexican extraction or descent and that such illegal result has been established in such school districts respectively. The school authorities of the City of Santa Ana have not memorialized any such official action, but petitioners assert that the same custom and usage exists in the schools of the City of Santa Ana under the authority of appropriate school agencies of such city.

The concrete acts complained of are those of the various school district officials in directing which schools the petitioning children and others of the same class or group must attend. The segregation exists in the elementary schools to and including the sixth grade in two of the defendant districts, and in the two other defendant districts through the eighth grade. The record before us shows without conflict that the technical facilities and physical conveniences offered in the schools housing entirely the segregated pupils, the efficiency of the teachers therein and the curricula are identical and in some respects superior to those in the other schools in the respective districts.

The ultimate question for decision may be thus stated: Does such official action of defendant district school agencies and the usages and practices pursued by the respective school authorities as shown by the evidence operate to deny or deprive the so-called non-English-speaking school children of Mexican ancestry or descent within such school districts of the equal protection of the laws?

The defendants at the outset challenge the jurisdiction of this court under the record as it exists at this time. We have already denied the defendants' motion to dismiss the action upon the "face" of the complaint. No reason has been shown which warrants reconsideration of such decision.

While education is a State matter, it is not so absolutely or exclusively. Cumming v. Board of Education of Richmond County, 175 U.S. 528, 20 S.Ct. 197, 201, 44 L.Ed. 262. In the Cumming decision the Supreme Court said: "That education of the people in schools maintained by state taxation is a matter belonging to the respective states, and *any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land.*" (Emphasis supplied.) See, also, Gong Lum v. Rice, 275 U.S. 78, 48 S. Ct. 91, 72 L.Ed. 172; Wong Him v. Callahan, C.C., 119 F. 381; Ward v. Flood, 48 Cal. 36, 17 Am.Rep. 405; Piper et al. v. Big Pine School District, 193 Cal. 664, 226 P. 926.

Obviously, then, a violation by a State of a personal right or privilege protected by the Fourteenth Amendment in the exercise of the State's duty to provide for the education of its citizens and inhabitants would justify the Federal Court to intervene. State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208. The complaint before us in this action, having alleged an invasion by the common school authorities of the defendant districts of the equal opportunity of pupils to acquire knowledge, confers jurisdiction on this court if the actions complained of are deemed those of the State. Hamilton v. Regents of University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343; cf. Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446.

Are the actions of public school authorities of a rural or city school in the State of California, as alleged and established in this case, to be considered actions of the State within the meaning of the Fourteenth Amendment so as to confer jurisdiction on this court to hear and decide this case under the authority of Section 24, Subdivision 14 of the Judicial Code, supra? We think they are.

■ In the public school system of the State of California the various local school districts enjoy a considerable degree of autonomy. Fundamentally, however, the people of the State have made the public school system a matter of State supervision. Such system is not committed to the exclusive control of local governments. Article IX, Constitution of California, Butterworth v. Boyd, 12 Cal.2d 140, 82 P.2d 434, 126 A.L.R. 838. It is a matter of general concern, and not a municipal affair. Esberg v. Badaracco, 202 Cal. 110, 259 P. 730; Becker v. Council of City of Albany, 47 Cal.App.2d 702, 118 P.2d 924.

■ The Education Code of California provides for the requirements of teachers' qualifications, the admission and exclusion of pupils, the courses of study and the enforcement of them, the duties of superintendents of schools and of the school trustees of elementary schools in the State of California. The appropriate agencies of the State of California allocate to counties all the State school money exclusively for the payment of teachers' salaries in the public schools and such funds are apportioned to the respective school districts within the counties. While, as previously observed, local school boards and trustees are vested by State legislation with considerable latitude in the administration of their districts, nevertheless, despite the decentralization of the educational system in California, the rules of the local school district are required to follow the general pattern laid down by the legislature, and their practices must be consistent with law and and with the rules prescribed by the State Board of Education. See Section 2204, Education Code of California.

When the basis and composition of the public school system is considered, there can be no doubt of the oneness of the system in the State of California, or of the restricted powers of the elementary school authorities in the political subdivisions of the State. See Kennedy v. Miller, 97 Cal.

429, 32 P. 558; Bruch v. Colombet, 104 Cal. 347, 38 P. 45; Ward v. San Diego School District, 203 Cal. 712, 265 P. 821.

In Hamilton v. Regents of University of California, supra, and West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 147 A.L.R. 674, the acts of university regents and of a board of education were held acts of the State. In the recent Barnette decision the court stated: "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." Although these cases dealt with State rather than local Boards, both are agencies and parts of the State educational system, as is indicated by the Supreme Court in the Barnette case, wherein it stated: "Such Boards are numerous and their territorial jurisdiction often small. But small and local authority may feel less sense of responsibility to the Constitution, and agencies of publicity may be less vigilant in calling it to account." Upon an appraisal of the factual situation before this court as illumined by the laws of the State of California relating to the public school system, it is clear that the respondents should be classified as representatives of the State to such an extent and in such a sense that the great restraints of the Constitution set limits to their action. Screws v. United States, 325 U.S. 91, 65 S.Ct. 1051; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110; Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Home Tel. & Tel. Co. v. Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L. Ed. 510.

■ We therefore turn to consider whether under the record before us the school boards and administrative authorities in the respective defendant districts have by their segregation policies and practices transgressed applicable law and Constitutional safeguards and limitations and thus have invaded the personal right which every public school pupil has to the equal protection provision of the Fourteenth Amendment to obtain the means of education.

We think the pattern of public education promulgated in the Constitution of California and effectuated by provisions of the Education Code of the State prohibits segregation of the pupils of Mexican an-

cestry in the elementary schools from the rest of the school children.

Section 1 of Article IX of the Constitution of California directs the legislature to "encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement" of the people. Pursuant to this basic directive by the people of the State many laws stem authorizing special instruction in the public schools for handicapped children. See Division 8 of the Education Code. Such legislation, however, is general in its aspects. It includes all those who fall within the described classification requiring the special consideration provided by the statutes regardless of their ancestry or extraction. The common segregation attitudes and practices of the school authorities in the defendant school districts in Orange County pertain solely to children of Mexican ancestry and parentage. They are singled out as a class for segregation. Not only is such method of public school administration contrary to the general requirements of the school laws of the State, but we think it indicates an official school policy that is antagonistic in principle to Sections 16004 and 16005 of the Education Code of the State.[3]

Obviously, the children referred to in these laws are those of Mexican ancestry. And it is noteworthy that the educational advantages of their commingling with other pupils is regarded as being so important to the school system of the State that it is provided for even regardless of the citizenship of the parents. We perceive in the laws relating to the public educational system in the State of California a clear purpose to avoid and forbid distinctions among pupils based upon race or ancestry[4] except in specific situations[5] not pertinent to this action. Distinctions of that kind have recently been declared by the highest judicial authority of the United States "by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." They are said to be "utterly inconsistent with American traditions and ideals." Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774.

Our conclusions in this action, however,

[3] "Sec. 16004. Any person, otherwise eligible for admission to any class or school of a school district of this State, whose parents are or are not citizens of the United States and whose actual and legal residence is in a foreign country adjacent to this State may be admitted to the class or school of the district by the governing board of the district."

"Sec. 16005. The governing board of the district may, as a condition precedent to the admission of any person, under Section 16004, require the parent or guardian of such person to pay to the district an amount not more than sufficient to reimburse the district for the total cost, exclusive of capital outlays, of educating the person and providing him with transportation to and from school. The cost of transportation shall not exceed ten dollars ($10) per month. Tuition payments shall be made in advance for each month or semester during the period of attendance. If the amount paid is more or less than the total cost of education and transportation, adjustment shall be made for the following semester or school year. The attendance of the pupils shall not be included in computing the average daily attendance of the class or school for the purpose of obtaining apportionment of State funds."

[4] Sec. 8501, Education Code. "Children between six and 21 years of age. The day elementary school of each school district shall be open for the admission of all children between six and 21 years of age residing within the boundaries of the district."

Sec. 8002. "Maintenance of elementary day schools and day high schools with equal rights and privileges. The governing board of any school district shall maintain all of the elementary day schools established by it, and all of the day high schools established by it with equal rights and privileges as far as possible."

[5] Sec. 8003. "Schools for Indian children, and children of Chinese, Japanese, or Mongolian parentage: Establishment. The governing board of any school district may establish separate schools for Indian children, excepting children of Indians who are wards of the United States Government and children of all other Indians who are descendants of the original American Indians of the United States, and for children of Chinese, Japanese, or Mongolian parentage."

Sec. 8004. "Same: Admission of children into other schools. When separate schools are established for Indian children or children of Chinese, Japanese, or Mongolian parentage, the Indian children or children of Chinese, Japanese, or Mongolian parentage shall not be admitted into any other school."

do not rest solely upon what we conceive to be the utter irreconcilability of the segregation practices in the defendant school districts with the public educational system authorized and sanctioned by the laws of the State of California. We think such practices clearly and unmistakably disregard rights secured by the supreme law of the land. Cumming v. Board of Education of Richmond County, supra.

"The equal protection of the laws" pertaining to the public school system in California is not provided by furnishing in separate schools the same technical facilities, text books and courses of instruction to children of Mexican ancestry that are available to the other public school children regardless of their ancestry. A paramount requisite in the American system of public education is social equality. It must be open to all children by unified school association regardless of lineage.

We think that under the record before us the only tenable ground upon which segregation practices in the defendant school districts can be defended lies in the English language deficiencies of some of the children of Mexican ancestry as they enter elementary public school life as beginners. But even such situations do not justify the general and continuous segregation in separate schools of the children of Mexican ancestry from the rest of the elementary school population as has been shown to be the practice in the defendant school districts—in all of them to the sixth grade, and in two of them through the eighth grade.

The evidence clearly shows that Spanish-speaking children are retarded in learning English by lack of exposure to its use because of segregation, and that commingling of the entire student body instills and develops a common cultural attitude among the school children which is imperative for the perpetuation of American institutions and ideals.[6] It is also established by the record that the methods of segregation prevalent in the defendant school districts foster antagonisms in the children and suggest inferiority among them where none exists. One of the flagrant examples of the discriminatory results of segregation in two of the schools involved in this case is shown by the record. In the district under consideration there are two schools,

the Lincoln and the Roosevelt, located approximately 120 yards apart on the same school grounds, hours of opening and closing, as well as recess periods, are not uniform. No credible language test is given to the children of Mexican ancestry upon entering the first grade in Lincoln School. This school has an enrollment of 249 so-called Spanish-speaking pupils, and no so-called English-speaking pupils; while the Roosevelt, (the other) school, has 83 so-called English-speaking pupils and 25 so-called Spanish-speaking pupils. Standardized tests as to mental ability are given to the respective classes in the two schools and the same curricula are pursued in both schools and, of course, in the English language as required by State law. Section 8251, Education Code. In the last school year the students in the seventh grade of the Lincoln were superior scholarly to the same grade in the Roosevelt School and to any group in the seventh grade in either of the schools in the past. It further appears that not only did the class as a group have such mental superiority but that certain pupils in the group were also outstanding in the class itself. Notwithstanding this showing, the pupils of such excellence were kept in the Lincoln School. It is true that there is no evidence in the record before us that shows that any of the members of this exemplary class requested transfer to the other so-called intermingled school, but the record does show without contradiction that another class had protested against the segregation policies and practices in the schools of this El Modeno district without avail.

While the pattern or ideal of segregating the school children of Mexican ancestry from the rest of the school attendance permeates and is practiced in all of the four defendant districts, there are procedural deviations among the school administrative agencies in effectuating the general plan.

In Garden Grove Elementary School District the segregation extends only through the fifth grade. Beyond, all pupils in such district, regardless of their ancestry or linguistic proficiency, are housed, instructed and associate in the same school facility.

This arrangement conclusively refutes the reasonableness or advisability of any segregation of children of Mexican ances-

---

6 The study of American institutions and ideals in all schools located within the State of California is required by Section 10051, Education Code.

try beyond the fifth grade in any of the defendant school districts in view of the standardized and uniform curricular requirements in the elementary schools of Orange County.

But the admitted practice and long established custom in this school district whereby all elementary public school children of Mexican descent are required to attend one specified school (the Hoover) until they attain the sixth grade, while all other pupils of the same grade are permitted to and do attend two other elementary schools of this district, notwithstanding that some of such pupils live within the Hoover School division of the district, clearly establishes an unfair and arbitrary class distinction in the system of public education operative in the Garden Grove Elementary School District.

The long-standing discriminatory custom prevalent in this district is aggravated by the fact shown by the record that although there are approximately 25 children of Mexican descent living in the vicinity of the Lincoln School, none of them attend that school, but all are peremptorily assigned by the school authorities to the Hoover School, although the evidence shows that there are no school zones territorially established in the district.

The record before us shows a paradoxical situation concerning the segregation attitude of the school authorities in the Westminister School District. There are two elementary schools in this undivided area. Instruction is given pupils in each school from kindergarten to the eighth grade, inclusive. Westminister School has 642 pupils, of which 628 are so-called English-speaking children, and 14 so-called Spanish-speaking pupils. The Hoover School is attended solely by 152 children of Mexican descent. Segregation of these from the rest of the school population precipitated such vigorous protests by residents of the district that the school board in January, 1944, recognizing the discriminatory results of segregation, resolved to unite the two schools and thus abolish the objectionable practices which had been operative in the schools of the district for a considerable period. A bond issue was submitted to the electors to raise funds to defray the cost of contemplated expenditures in the school consolidation. The bonds were not voted and the record before us in this action reflects no execution or carrying out of the official action of the board of trustees taken on or about the 16th of January, 1944. It thus appears that there has been no abolishment of the traditional segregation practices in this district pertaining to pupils of Mexican ancestry through the gamut of elementary school life. We have adverted to the unfair consequences of such practices in the similarly situated El Modeno School District.

Before considering the specific factual situation in the Santa Ana City Schools it should be noted that the omnibus segregation of children of Mexican ancestry from the rest of the student body in the elementary grades in the schools involved in this case because of language handicaps is not warranted by the record before us. The tests applied to the beginners are shown to have been generally hasty, superficial and not reliable. In some instances separate classification was determined largely by the Latinized or Mexican name of the child. Such methods of evaluating language knowledge are illusory and are not conducive to the inculcation and enjoyment of civil rights which are of primary importance in the public school system of education in the United States.

It has been held that public school authorities may differentiate in the exercise of their reasonable discretion as to the pedagogical methods of instruction to be pursued with different pupils.[7] And foreign language handicaps may be to such a degree in the pupils in elementary schools as to require special treatment in separate classrooms. Such separate allocations, however, can be lawfully made only after credible examination by the appropriate school authority of each child whose capacity to learn is under consideration and the determination of such segregation must be based wholly upon indiscriminate foreign language impediments in the individual child, regardless of his ethnic traits or ancestry.

The defendant Santa Ana School District maintains fourteen elementary schools which furnish instruction from kindergarten to the sixth grade, inclusive.

About the year 1920 the Board of Education, for the purpose of allocating pupils to the several schools of the district in proportion to the facilities available at such

---

7 See Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256.

schools, divided the district into fourteen zones and assigned to the school established in each zone all pupils residing within such zone.

There is no evidence that any discriminatory or other objectionable motive or purpose actuated the School Board in locating or defining such zones.

Subsequently the influx of people of Mexican ancestry in large numbers and their voluntary settlement in certain of the fourteen zones resulted in three of the zones becoming occupied almost entirely by such group of people.

Two zones, that in which the Fremont School is located, and another contiguous area in which the Franklin School is situated, present the only flagrant discriminatory situation shown by the evidence in this case in the Santa Ana City Schools. The Fremont School has 325 so-called Spanish-speaking pupils and no so-called English-speaking pupils. The Franklin School has 237 pupils of which 161 are so-called English-speaking children, and 76 so-called Spanish-speaking children.

The evidence shows that approximately 26 pupils of Mexican descent who reside within the Fremont zone are permitted by the School Board to attend the Franklin School because their families had always gone there. It also appears that there are approximately 35 other pupils not of Mexican descent who live within the Fremont zone who are not required to attend the Fremont School but who are also permitted by the Board of Education to attend the Franklin School.

Sometime in the fall of the year 1944 there arose dissatisfaction by the parents of some of the so-called Spanish-speaking pupils in the Fremont School zone who were not granted the privilege that approximately 26 children also of Mexican descent, enjoyed in attending the Franklin School. Protest was made en masse by such dissatisfied group of parents, which resulted in the Board of Education directing its secretary to send a letter to the parents of all of the so-called Spanish-speaking pupils living in the Fremont zone and attending the Franklin School that beginning September, 1945, the permit to attend Franklin School would be withdrawn and the children would be required to attend the school of the zone in which they were living, viz., the Fremont School.

There could have been no arbitrary discrimination claimed by plaintiffs by the action of the school authorities if the same official course had been applied to the 35 other so-called English-speaking pupils exactly situated as were the approximate 26 children of Mexican lineage, but the record is clear that the requirement of the Board of Education was intended for and directed exclusively to the specified pupils of Mexican ancestry and if carried out becomes operative solely against such group of children.

It should be stated in fairness to the Superintendent of the Santa Ana City Schools that he testified he would recommend to the Board of Education that the children of those who protested the action requiring transfer from the Franklin School be allowed to remain there because of long attendance and family tradition. However, there was no official recantation shown of the action of the Board of Education reflected by the letters of the Secretary and sent only to the parents of the children of Mexican ancestry.

The natural operation and effect of the Board's official action manifests a clear purpose to arbitrarily discriminate against the pupils of Mexican ancestry and to deny to them the equal protection of the laws.

The court may not exercise legislative or administrative functions in this case to save such discriminatory act from inoperativeness. Cf. Yu Cong Eng v. Trinidad, 271 U.S. 500, 46 S.Ct. 619, 70 L.Ed. 1059.

There are other discriminatory customs, shown by the evidence, existing in the defendant school districts as to pupils of Mexican descent and extraction, but we deem it unnecessary to discuss them in this memorandum.

We conclude by holding that the allegations of the complaint (petition) have been established sufficiently to justify injunctive relief against all defendants, restraining further discriminatory practices against the pupils of Mexican descent in the public schools of defendant school districts. See Morris v. Williams, 8 Cir., 149 F.2d 703.

Findings of fact, conclusions of law, and decree of injunction are accordingly ordered pursuant to Rule 52, F.R.C.P.

Attorney for plaintiffs will within ten days from date hereof prepare and present same under local Rule 7 of this court.