**HARDYMAN et al. v. COLLINS et al.**

No. 8004-Y.

United States District Court
S. D. California, C. D.

Oct. 4, 1948.

Loren Miller, Edmund Cooke, Mortimer Vogel, Thelma Herzing, and William B. Esterman, all of Los Angeles, Cal., Jane Grodzins, of Hollywood, Cal., and A. L. Wirin, of Los Angeles, Cal., for plaintiffs.

George Penney and Robert M. Newell, both of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

## I. The Civil Rights Statute and Its Implications

The action is instituted under the first clause of Subdivision (3) of Section 47 of Title 8 U.S.C.A., which reads:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of

any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

▮ The object of this enactment is to give to persons injured as the result of the three types of conspiracies it designates, a claim for damages against the participants.

It is implemented by Subdivision (1) of Section 1343 of Title 28 U.S.C.A., in effect September 1, 1948, which is a recodification of Section 41(12) of the old Title 28 U.S.C.A., which, in turn, reads:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 47 of Title 8".

▮ It is beyond dispute that the Government of the United States may exercise, within the limits of its sovereignty, and upon the soil which is a part of the United States, its powers and functions.[1]

▮ From this flows the power of the Congress of the United States to secure, through criminal or civil sanctions, the protection of the rights which the Constitution guarantees to individuals. The scope of such legislation and the type of the rights to the protection of which it may be directed, is well stated in Re Quarles and Butler:[2]

"The United States are a nation, whose powers of government, legislative, executive, and judicial, within the sphere of action confided to it by the Constitution, are supreme and paramount. Every right, created by, arising under, or dependent upon the constitution, may be protected and enforced by such means and in such manner as congress, in the exercise of the correlative duty of protection, or of the legislative powers conferred upon it by the constitution, may in its discretion deem most eligible and best adapted to attain the object. Logan v. United States, 144 U.S. [263], 293, 12 S.Ct. 617, [36 L.Ed. 429].

"Section 5508 of the Revised Statutes [18 U.S.C.A. § 241] provides for the punishment of conspiracies 'to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same.'

"Among the rights and privileges which have been recognized by this court to be secured to citizens of the United States by the constitution are the right to petition congress for a redress of grievances (United States v. Cruikshank, 92 U.S. 542, 553, [23 L.Ed. 588]); and the right to vote for presidential electors or members of Congress (Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, [28 L.Ed. 274]); and the right of every judicial or executive

---

[1] Ex parte Siebold, 1879, 100 U.S. 371, 394, 395, 25 L.Ed. 717; In re Neagle, 1889, 135 U.S. 1, 68, 69, 10 S.Ct. 658, 34 L.Ed. 55; Logan v. United States, 1892, 144 U.S. 263, 294, 295, 12 S.Ct. 617, 36 L.Ed. 429.

[2] In re Quarles and Butler, 1895, 158 U.S. 532, 535, 15 S.Ct. 959, 960, 39 L.Ed. 1080. And see, Snowden v. Hughes, 1944, 321 U.S. 1, 6, 7, 64 S.Ct. 397, 88 L.Ed. 497.

officer, or other person engaged in the service or kept in the custody of the United States, in the course of the administration of justice, to be protected from lawless violence. There is a peace of the United States, In re Neagle, 135 U.S. 1, 69, 10 S.Ct. 658 [34 L.Ed. 55]; Logan v. United States, above cited."

## II. National or State Rights

We thus find recognition of the following as rights, privileges and immunities stemming from the Constitution of the United States: The right of assembly and to petition the Congress for redress of grievances;[3] the right to discuss national legislation or national affairs[4]; the right to vote for presidential electors and members of the Congress[5]; the right to protection of person, while in the custody of an officer of the United States[6]; the right to engage in a profession such as the practice of law before federal courts[7]; the right to move from state to state.[8]

At the same time, invasions of purely personal rights, the protection of which is within the domain of state power, does not come under the protective shield of general national sovereignty or of statutes such as the Civil Rights Statute, a portion of which is under consideration here.[9] The following rights are in this category: protection against violence when not in the custody of a federal officer[10]; the right of employment[11]; the right to exercise freedom of the press[12]; the right to testify before a grand jury[13]; the right

to employment by public bodies[14]. The case last referred to contains a very succinct summary of the holdings we have just epitomized: "The statutes which the appellant seeks to invoke were passed shortly after the Civil War to aid in the enforcement of the Thirteenth Amendment abolishing slavery, the Fourteenth Amendment prohibiting State action the effect of which would be to abridge the privileges or immunities of citizens of the United States or to deprive any person of life, liberty or property without due process or to deny any person the equal protection of the law, and the Fifteenth Amendment prohibiting the denial of the right to vote on account of race or color. See Buchanan v. Warley, 245 U.S. 60, 78, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A. 1918C, 210, Ann.Cas. 1918A, 1201. The statutes were intended to provide for redress against State action and primarily that which discriminated against individuals within the jurisdiction of the United States. Hague v. Committee for Industrial Organization, 307 U.S. 496, 509-514, 59 S.Ct. 954, 83 L.Ed. 1423; Hodges v. United States, 203 U.S. 1, 14-20, 27 S.Ct. 6, 51 L.Ed. 65; Logan v. United States, 144 U.S. 263, 290, 291, 12 S.Ct. 617, 36 L.Ed. 429. The statutes, while they granted protection to persons from conspiracies to deprive them of the rights secured by the Constitution and laws of the United States (United States v. Mosley, 238 U.S. 383, 387, 388, 35 S.Ct. 904, 59 L.Ed. 1355), *did not have the effect of taking into federal control the protection of private rights against*

---

[3] United States v. Cruikshank, 1875, 92 U.S. 542, 23 L.Ed. 588; In re Quarles and Butler, 1895, 158 U.S. 532, 535, 15 S.Ct. 959, 39 L.Ed. 1080; Powe v. United States, 5 Cir., 1940, 109 F.2d 147.

[4] Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

[5] Ex parte Yarbrough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274.

[6] In re Neagle, 1889, 135 U.S. 169, 10 S.Ct. 658, 34 L.Ed. 55; In re Quarles and Butler, 1895, 158 U.S. 532, 535, 15 S.Ct. 959, 39 L.Ed. 1080.

[7] Green v. Elbert, 8 Cir., 1894, 63 F. 308; Mitchell v. Greenough, 9 Cir., 1938, 100 F.2d 184.

[8] Twining v. New Jersey, 1908, 211 U.S. 78, 79, 97, 29 S.Ct. 14, 53 L.Ed. 97; Crandall v. Nevada, 1867, 6 Wall. 35, 47, 18 L.Ed. 744; United States v. Wheeler,

1920, 254 U.S. 281, 299, 41 S.Ct. 133, 65 L.Ed. 270; and see, the concurring opinion of Mr. Justice Douglas in Edwards v. California, 1941, 314 U.S. 160, 177, et seq., 62 S.Ct. 164, 86 L.Ed. 119.

[9] 8 U.S.C.A. § 47. See, Snowden v. Hughes, 1944, 321 U.S. 1, 6, 7, 64 S.Ct. 397, 88 L.Ed. 497.

[10] United States v. Harris, 1882, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290. And see, Bomar v. Bogart, 2 Cir., 1947, 159 F. 2d 338.

[11] Hodges v. United States, 1906, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65.

[12] Powe v. United States, 5 Cir., 1940, 109 F.2d 147.

[13] United States v. Sanges, C.C.Ga. 1891, 48 F. 78.

[14] Love v. Chandler, 8 Cir., 1942, 124 F.2d 785, 786.

*invasion by individuals.* Hodges v. United States, 203 U.S. 1, 14-20, 27 S.Ct. 6, 51 L.Ed. 65; Logan v. United States, 144 U.S. 263, 282-293, 12 S.Ct. 617, 36 L.Ed. 429. *The protection of such rights and redress for such wrongs was left with the States."* (Emphasis added.)

Inherent in the problem before us is the view that, as a rule, civil rights "cannot be impaired by the wrongful acts of individuals, unsupported by state authority in the shape of laws, customs, or judicial or executive proceedings."[15]

This is not to say that the Congress may not, in the exercise of its constitutional power, give a right of action against individuals who conspire to interfere with the exercise of purely national rights.

We postulate that it may, and so stated at the hearing. But, in considering whether it did so in the particular instance, the language of the statute must be considered in the light of these rulings. It is to be noted that, while Section 1343 of Title 28 U.S.C.A. *(the jurisdictional section)* speaks of "deprivation of any right or privilege of a citizen of the United States", *the section creating the substantive rights*[16] is narrower. It makes the right of action stem from conspiracy aiming to deprive a person "of the *equal* protection of the laws, or of *equal* privileges and immunities under the laws." (Emphasis added.)

The qualifying word "equal" presupposes State action. For, as said by Supreme Court in the Civil Rights Cases[17]: "The wrongful act of an individual, unsupported by any such authority, is simply *a private wrong,* or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the state, or not done under state authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the state for redress. An individual *cannot deprive* a man of his right to vote, to hold property, to buy and to sell, to sue in the courts, or to be a witness or a juror; he may, by force or fraud, interfere with the enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow-citizen; but unless protected in these wrongful acts by some shield of state law or state authority, he cannot destroy or injure the right; he will only render himself amenable to satisfaction or punishment; and amenable therefor to the laws of the state where the wrongful acts are committed. Hence, in all those cases where the constitution seeks to protect the rights of the citizen against discriminative and unjust laws of the state by prohibiting such laws, it is not individual offenses, but abrogation and denial of rights, which it denounces, and for which it clothes the congress with power to provide a remedy. This abrogation and denial of rights, for which the states alone were or could be responsible, was the great seminal and fundamental wrong which was intended to be remedied. And the remedy to be provided must necessarily be predicated upon that wrong. It must assume that in the cases provided for, the evil or wrong actually committed rests upon some state law or state authority for its excuse and perpetration".

Otherwise said, only the State, or those acting or assuming to act in its behalf, can interfere with the *equal* protection of law or be guilty of acts amounting to a denial of *equal* privileges by discriminating against an individual or group. When it does so, it breeds inequality. But when

---

[15] In re Civil Rights Cases, 1883, 109 U.S. 3, 17, 3 S.Ct. 18, 25, 27 L.Ed. 835; and See, United States v. Harris, 1883, 106 U.S. 629, 643, 1 S.Ct. 601, 612, 27 L.Ed. 290, where the Court uses this language: "A private person cannot make constitutions or laws, nor can he with authority construe them, nor can he administer or execute them. The only way, therefore, in which one private person can deprive another of the equal protection of the laws is by the commission of some offense against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault, or murder."

[16] 8 U.S.C.A. § 47(3).

[17] In re Civil Rights Cases, 1883, 109 U.S. 1, 17, 18, 3 S.Ct. 25, 27 L.Ed. 835.

an individual interferes with the rights of another, we are in the domain of *private right*.

█ And, unless the act denounced is in aid of State action, which results in deprivation of equality, the wrong is a private wrong,—assault, battery, trespass, or the like,—and not within the statute.

█ This conclusion is reinforced by the fact that "equal protection of the laws" implies guarantee by the State, not by individuals, acting in dissociation from state power.[18]

Illustrative are the recent restrictive covenant cases. The Supreme Court, while denying judicial aid to their enforcement, does not question their validity as contracts between individuals.[19] This serves to emphasize the fact that, while in the realm of civil rights, the recent decisions of the Supreme Court have inaugurated what two recent historians of constitutional law have called "a new era in civil liberties"[20], the change of approach has meant chiefly the staying of the hand of official arbitrariness or refusal to grant judicial sanction to agreements grounded on inequality. But the same court has hesitated to create a new tort liability even in favor of the government, in the absence of direct congressional authorization.[21]

III. The Pleadings in Summary

We now consider the motion to dismiss the amended complaint on file. The basis for the motion is that the amended complaint does not state a claim under Section

---

[18] Statutes in aid of it condemn, as does the Fourteenth Amendment, all use or abuse of power by "every person, whether natural or juridical, who is the repository of state power". Home Telephone & Telegraph Co. v. Los Angeles, 1913, 227 U.S. 278, 286, 33 S.Ct. 312, 314, 57 L.Ed. 510. And see, Hodges v. United States, 1906, 203 U.S. 1, 14, 27 S.Ct. 6, 51 L.Ed. 65; Truax v. Raich, 1915, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283; Meyer v. Nebraska, 1923, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446; West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330; Mendez v. Westminster School District, D.C.Cal., 1946, 64 F. Supp. 544, per McCormick, J.; Westminster School District of Orange County v. Mendez, 9 Cir., 1947, 161 F.2d 774.

[19] Shelley v. Kraemer, 1948, 334 U.S. 1, 8–23, 68 S.Ct. 836; Hurd v. Hodge, 1948, 334 U.S. 24, 31, 68 S.Ct. 847. I advert to the fact that many years ago (in 1928), I declined, as a State Judge, to recognize such private agreements as covenants running with the land, and denied injunctive relief to enforce them, only to be overruled by the higher courts of California. See, Littlejohns v. Henderson, 1931, 111 Cal.App. 115, 295 P. 95. Which brings home the fact that a trial judge cannot "innovate at pleasure." Cardozo: The Nature of the Judicial Process, p. 141. Nor can he follow minority opinions. See my observations in re Lindsay-Strathmore Irr. District, D.C.Cal.1937, 21 F.Supp. 129, 135; and in United States v.

Standard Oil Co. et al., D.C.1948, 78 F. Supp. 850.

Restrictive race covenants are a part of what a brilliant foreign student of American institutions has called "The American Dilemma". See, Gunnar Myrdall, The American Dilemma, 1944. On the historical phase of the whole problem, see Leon Whipple, The History of Civil Liberties in the United States, 1928, pp. 169–209; Osmond Fraenkel, Our Civil Liberties, 1944, pp. 189–197. Mr. Fraenkel, who has been a leading exponent of civil liberties, both in thought and action, sums up the law on the cases arising under the privileges and immunities clause in this manner: "The constitutionality of such laws (laws which would punish all persons participating in unlawful acts such as lynching) has been questioned since they punish not only state officials but private individuals as well, and the Supreme Court has repeatedly ruled that all the provisions of the Fourteenth Amendment guarantee protection against state action alone. *Private wrongdoing may be punished by the states, not as a rule by the federal government.*" (Emphasis added.) See, Note, Applicability of the Fourteenth Amendment to Private Organizations, 1948, 61 Harv.L. Rev. 344.

[20] Alfred H. Kelly and Winfred A. Harbison, The American Constitution, Its Origins and Development, 1938, pp. 790 et seq.

[21] United States v. Standard Oil Co., 1947, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067. The Circuit Court opinion is Standard Oil Co. of California v. United States, 9 Cir., 1946, 153 F.2d 958. And see my opinion in the same case, United States v. Standard Oil Co., D.C.Cal. 1945, 60 F.Supp. 807.

47(3) of Title 8 U.S.C.A., or show that a federally protected right was invaded.

In summary, the allegations of the amended Complaint are these:

Plaintiffs are members of the Crescenta-Canada Democratic Club in Los Angeles County, Hardyman being the Chairman of the Program Committee, Morse, Chairman of the Club and Cummings former secretary. The Club is a political club organized by the Los Angeles County Democratic Central Committee and is an officially recognized club of the Democratic Party.

Among its purposes are participation in the election of the officers of the United States, including the President, Vice President, and members of the Congress. It has, as other objects, the petitioning of the national government for redress of grievances and holding public meetings for the discussion of national issues by the members as citizens of the United States.

The defendants also reside in the same County and in our judicial district.

The Club held public meetings from time to time and a public meeting was scheduled in the City of La Crescenta for the evening of November 14, 1947, which was to be addressed by David Leff, a former official of UNRRA. He was to speak on the external policy of the United States, under the title of "The Cominform and the Marshall Plan". Public discussion was to follow, and it was proposed that the topic would be the subject of a resolution. Prior to the scheduled meeting of November 14th, the Club had adopted a policy of opposition to the Marshall Plan, and had, from time to time, adopted resolutions criticizing the plan and petitioned "the Government of the United States for a redress of grievances with respect of said Plan by forwarding said resolutions to the President of the United States, the State Department. and members of the Congress of the United States." It was intended to present a resolution of similar import at the scheduled meeting. The defendants, prior to the date, and knowing of the proposed meeting, entered into a conspiracy to deprive the plaintiffs and the members of the Crescenta-Canada Democratic Club "as citizens of the United States, of privileges and immunities, as citizens of the United States, of the rights peaceably to assemble for the purpose of discussing and communicating upon national public issues, namely, the external and international policies of the United States, * * * Defendants further unlawfully conspired to deprive the plaintiffs as well as the members of said club, as citizens of the United States, of equal privileges and immunities under the laws of the United States, * * * in that, to the knowledge of said defendants, many public meetings had been scheduled, and held in the County of Los Angeles prior to said November 14, 1947, and resolutions were adopted thereat, which * * * public meetings were scheduled and held, and which resolutions had been adopted, by groups and organizations, with whose opinions on international issues * * * defendants agreed."

While the defendants had not interfered with the prior meetings and resolutions, the amended complaint states that they conspired specifically with regard to the meeting of November 14, 1947, because they were opposed to the views of the plaintiffs and of the club and its members. So the object of the conspiracy was to interfere with the adoption "and transmission of a resolution by (the) club upon (the) subject, * * * for the reason that (the) defendants opposed the views to be set forth in (the) resolution."

In addition to the conspiracy just mentioned, the amended complaint states that the defendants also conspired "to go in disguise upon the highways of the City of La Crescenta and upon the premises of (the) meeting place in said City of La Crescenta, (the) disguise consisting of the unlawful and unauthorized wearing of caps of the American Legion." So disguised, the defendants proceeded on the highways of La Crescenta to the premises where the meeting was held. Arriving there, they assaulted and intimidated the plaintiffs and those present at the meeting. The defendant Berkheimer pushed and shoved the plaintiff Hardyman. All the defendants ordered the plaintiffs and all persons present at the meeting to break up the meeting and to leave the premises against the wills of the

plaintiffs and of those present at the meeting. By such action, they prevented, in addition, the adoption and transmission of the resolution and interfered with the rights of the plaintiffs to petition the government for a redress of grievances pertaining to the Marshall Plan.

Damages by reason of intimidation, fear of bodily harm, humiliation and indignity are sought in the sum of $5000. And, because, it is averred, the actions of the defendants were wanton, malicious and arbitrary, punitive damages in the amount of $20,000 are asked.

## IV. No Disguise

Before gauging these allegations by the principles discussed in the first portion of this opinion, we dismiss from consideration the allegation of disguise. The clause of the section [22] dealing with disguise uses the word in its ordinary sense. It refers to the manner in which the contemporaneous organization at which it was directed,—the Ku Klux Klan—acted, that is, concealment of identity by masks and vestments which covered the entire or part of a person's body to such an extent as to make identification difficult, if not impossible.

The verb "disguise" is defined as follows: "(1) To change the style of dress of; formerly to dress (oneself) in outlandish, unfamiliar or fantastic fashion; now, to change the customary dress or appearance of; so as to conceal one's identity or counterfeit another's; as, to disguise oneself as a servant; the costume disguised her. * * * (3) To hide or obscure the true nature or character of, by altering appearances or distinguishing quality; to conceal by misrepresentation or counterfeiting; to cloak, mask, as, to disguise anger, one's sentiments, the taste of quinine." [23]

The noun "disguise" means: " * * * (2) Unfamiliar or characteristic style of dress or apparel assumed to conceal one's identity; as a king in disguise. Hence that which is used to conceal one's identity or counterfeit another's; specif., a player's or masker's costume, etc.; as grotesque disguises at a masquerade. (3) Any outward form, which, intentionally or not, misrepresents the true nature or identity of a person, or thing ; a deceptive appearance; as blessings in disguise; also pretense or pretentious appearance; artifice or insincerity, esp. in manners, speech, etc.; as, to throw off all disguise; hence any misleading lack of correspondence between appearance and reality; deception; speciousness. 'Without fear or evil or disguise'." [24]

Historically, the meaning has remained unchanged since the 16th Century.[25] This is also the legal meaning of the word.[26]

The wearing of the caps of the American Legion, whether authorized or unauthorized,—which is the only form of disguise charged—does not constitute disguise.

So the sufficiency of the amended complaint must be determined under the conspiracy clause of the section involved.

## V. Violation of National Right?

The conspiracy clause is unrelated to the disguise, it being an alternative to it.

We again advert to the fact that in the cases which have interpreted the civil rights statute,[27] in its various forms, from which this section derives [28], and in which recognition was given to certain rights as national in scope, either under the equal protection [29] or privileges or immunities [30] clauses,—both of which are protected by the Fourteenth Amendment,—the deprivation or infringement of which the courts took cognizance were those of persons acting or claiming to act in official capacities as agents of public bodies,—states or state agencies or arms,—or individuals acting in concert with or in aid of agents or repre-

22 8 U.S.C.A. § 47(3).
23 Webster's Unabridged Dictionary, 1937 Edition, page 747, Col. 3.
24 Webster's Unabridged Dictionary, 1937 Edition, page 747, Col. 3.
25 See Shorter Oxford English Dictionary, 1933, Vol. I, p. 526.
26 Vol. 12, Words and Phrases, Perm.

Ed., page 695; 27 C.J.S., Disguise, pages 146, 147.
27 8 U.S.C.A. § 47(3).
28 See cases cited in Notes 1–15.
29 Constitution of the United States, Amendments V and XIV, § 1.
30 Constitution of the United States, Art. IV, § 2, Cl. 1.

sentatives of such public bodies.[31] We find them to be election officials [32] or others interfering with the right of suffrage of Negroes [33], or a state guard [34] the mayor and other municipal officers of a city [35], the prosecuting attorney and the judge of a state court [36]. No cases exist where an action either civil or criminal has been maintained against private persons who interfered with such rights. And, while the cases intimate that actions might be maintained if the allegations of a complaint showed the specific violation of a right, the cases in which the intimation was made were clearly race discrimination cases where the object was to prevent the exercise of civil rights by persons of the Negro race for whose benefit the Fourteenth Amendment to the Constitution was passed.[37] Granted that the rights secured by the Constitution, unlike those secured by the 14th and 15th amendment, are immune "against the action of individuals as well as of States" [38], we are not concerned here with an attempt to secure from Governmental bodies as such or individuals acting or pretending to act under the protection of such bodies, obedience to constitutional command. What we must decide is whether a special remedy created by a special statute applies to individuals acting as such and preventing, not by authority real or arrogated, but by threats and physical violence, a meeting, the object of which was to discuss a national problem, and, at the conclusion of it, to submit for adoption a resolution relating to the foreign policy of the United States for forwarding to the State Department and others connected with the national government.

The amended complaint does not allege that it was the aim of the conspiracy to prevent the plaintiffs from holding *any* meetings. On the contrary, it is stated that a prior meeting by the same group, at which similar resolutions were adopted *was not* interfered with, although its objects were known to the defendants.

■ So we have, at best, a sporadic incident, consisting of a series of acts by which persons of certain political opinions, *unrelated to race,* are interfered with on the private property of an individual by acts which, taking the statements of the amended complaint at their full value, amount to and are punishable under state law as disturbances of the peace [39], assault [40], trespass [41], and are actionable as such.

## VI. No Repository of State Power

■ Two conditions must concur before liability under the civil rights statute attaches: (1) There must be a violation of a national right, and (2) such violation must

[31] In re Quarles and Butler, 1895, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080; United States v. Sanges, D.C.Ga., 1891, 48 F. 78.

[32] Ex parte Siebold, 1879, 100 U.S. 371, 25 L.Ed. 717; See also United States v. Classic, 1941, 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368; Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110.

[33] Ex parte Yarbrough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274.

[34] Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429.

[35] Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

[36] Mitchell v. Greenough, 9 Cir., 1938, 100 F.2d 184.

[37] See cases cited in Notes 33, 34, 35, 36. And see, Allen v. Corsano, D.C.Del., 1944, 56 F.Supp. 169.

[38] United States v. Classic, 1941, 313 U.S. 299, 315, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368, and see Clyatt v. United States, 1905, 197 U.S. 207, 218, 25 S.Ct. 429, 49 L.Ed. 726.

[39] Cal. Penal Code, Section 415 (disturbance of the peace of neighborhood or person); Section 403 (disturbance of public meetings).

[40] Cal. Penal Code, Section 602(j) (illegal entry for the purpose of injuring property or property rights or interfering or obstructing lawful business of another).

[41] Cal. Penal Code, Sections 240, 241 (assault); sections 242, 243 (battery). Among the corresponding civil sections relating to civil remedies are California Civil Code, Section 43 (guarantee against personal bodily harm or restraint); Government Code, Section 241 (defining as citizens all persons born or residing within the state); California Code of Civil Procedure, Section 338(3) (action for trespass to real property may be brought within three years); section 340(3) (action for assault and battery may be brought within one year). And for the state civil rights provisions, see California Civil Code, Sections 51–54.

be by the State, one of its agencies, or persons being or claiming to be, repositories of state power.

The acts complained of here, in their ultimate effect, are of the character which the Court in Love v. Chandler [42] held outside the purview of this statute. While the court there was dealing with the right of employment by the United States, the language used applies with great force to the situation here *because it stresses the inapplicability of the statute to acts by individuals of the type here involved,* and the fact that redress for violation of such rights must be sought under the state law. We quote: "The appellant does not seek *redress because the State of Minnesota is discriminating against him, or because its laws fail to afford him equal protection.* We have already held that he had no absolute right under the laws of the United States to have or retain employment by the Works Progress Administration. The appellant seeks damages because certain persons, *as individuals,* have allegedly conspired to injure him and have *injured him by individual and concerted action. The wrongs allegedly suffered by the appellant are assault and battery, false imprisonment, and interference with his efforts to obtain and retain employment with the Works Progress Administration. The protection of the rights allegedly infringed and redress for the alleged wrongs are, we think within the exclusive province of the State.* Compare Hodges v. United States, 203 U.S. 1, 27 S. Ct. 6, 51 L.Ed. 65; Carter v. Greenhow, 114 U.S. 317, 330, 5 S.Ct. 928, 962, 29 L. Ed. 202, 207." [43]

Implicit in these rulings is the fact that the chief aim of all the civil rights legislation is to implement the guarantee of equality of the Fourteenth Amendment. And there runs through the decisions the idea that acts which *might be* denial of such guarantee by the State or its agencies *would not necessarily* be a foundation for actionable liability when done by individuals. The Supreme Court has made this clear in the race restriction cases to which allusion has already been made. In Shelley v. Kraemer [44], the Court says: "Since the decision of this Court in the Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. *That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.* We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as a violation of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated. Cf. Corrigan v. Buckley, supra (271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969)." (Emphasis added.)

In the companion case [45], a similar interpretation is placed on the statute [46] which guarantees to all citizens equal rights in the ownership and enjoyment of real property: "We may start with the proposition that the statute does not invalidate private restrictive agreements so long as the purposes of those agreements are achieved by the parties through voluntary adherence to the terms. The action toward which the pro-

---

[42] Love v. Chandler, 8 Cir., 1942, 124 F.2d 785.

[43] Love v. Chandler, 8 Cir., 1942, 124 F.2d 785, 787. And see the equally forceful language in Bomar v. Bogart, 2 Cir., 1947, 159 F.2d 338, 339, 340.

[44] 334 U.S. 1, 13, 68 S.Ct. 836, 842. It is revealing that as authorities for the statement italicized the court refers to United States v. Harris, 1883, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290, and United States v. Cruikshank, 1876, 92 U.S. 542, 23 L.Ed. 588. So that there is no warrant for the contention that the language of these cases justifies a broad interpretation of the civil rights statutes which would make them a shield against all kinds of private wrongs which interfere with civil rights. See Milton R. Konvitz: The Constitution and Civil Rights, 1947, pp. 97 et seq. It is to be noted that the same author questions the constitutionality and usefulness of the clause under discussion. Op.Cit., p. 101.

[45] Hurd v. Hodge, 1948, 334 U.S. 24, 68 S.Ct. 847.

[46] 8 U.S.C.A. § 42.

visions of the statute under consideration is directed is governmental action. Such was the holding of Corrigan v. Buckley, supra." [47]

Back of these rulings is the historical fact that the equality which the Fourteenth Amendment sought to establish called for protection against discrimination by state action. As said by the Court: "The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color. Seventy-five years ago this Court announced that the provisions of the Amendment are to be construed with this fundamental purpose in mind." [48]

### VII. No Action by Repositories of

### State Power

These declarations have a special meaning and should have great weight in the solution of the problem which confronts us in this case. For they appear in cases which interpret a statute antedating the adoption of the Fourteenth Amendment and by which the federal government placed its entire power behind a policy guaranteeing equality in the ownership, enjoyment and disposition of real and personal property to all persons having national citizenship. And the Courts, in giving effect to the letter and spirit behind the policy, nullified state action both in the several states and in the District of Columbia contrary to its terms by insisting that the judicial branch should not aid persons entering into agreements violating the policy of the law. Yet, at the same time, the court declared unequivocally that the contracts which lay back of the state action,—i.e. *the contracts for the enforcement of which judicial aid was sought,*—

were legal as between the parties themselves.

These two apparently antipodal conclusions can be harmonized only on the assumption that statutes seeking to carry into effect constitutional provisions against discrimination and denial of equality are, in the main, directed at those, who, through exercise or abuse of official power, can make these guarantees nugatory. Rightly. For, while a person may, by his action toward another, deprive him of the enjoyment of a right, only persons exercising official power can, by their action, deprive the person of *equal* rights. For the essence of the constitutional guarantees on that subject, as of other constitutional guarantees, is the assertion of rights *against sovereign power and the limitation of sovereign power in the realm of those rights.* The race restriction decisions which we are discussing are the most recent illustrations of this approach. For, if the broad contention of the plaintiffs were to prevail, and if it were laid down as an axiom that the infringement of *any right guaranteed by federal statute or inherent in national citizenship,* on the basis of race or otherwise, by individuals conspiring to that end, comes within the purview of Subdivision (3) of Section 47 of Title 8 U.S.C.A., as a denial of equal protection of the laws or of equal privileges and immunities under the law, persons denied equality in the ownership, enjoyment or disposition of property could seek redress by way of damages against the parties to such covenants. Such a construction would fly in the teeth of the declarations just referred to. For it is inconceivable that the Supreme Court would have declared, in so many words, *these contracts to be valid between the parties agreeing to restrict the ownership of property within a district to certain groups,* if it had intended to leave open the signatories of such contracts to actions for damages, under this statute, by any of the excluded persons. For a right of action depends on the concurrence of wrong and damage. And

[47] Hurd v. Hodge, supra, 334 U.S. at page 31, 68 S.Ct. at page 851. See, D. O. McGovney, Racial Residential Segregation, 1945, 33 Cal.L.Rev. 5. On the economic phases of segregation, see, Oscar I.

Stern, The End of The Restrictive Covenant, 1948, 16 The Appraisal Journal, 434.

[48] Shelley v. Kraemer, supra, 334 U.S. at page 23, 68 S.Ct. at page 847.

a loss arising from acts or conditions which do not create ground for legal distress is *damnum abseque injuria*.[49] The Supreme Court must be assumed to have had these maxims in view when it declared the agreements legal between the parties, although unenforceable with the aid of the State.

Of course, when speaking of a "wrong", we are excluding ethical considerations. We refer to wrongs in the legal sense only, —that is, wrongs cognizable in law and which may be the object of redress through the judicial process.

## VIII. Conclusion

In a complex world, legislative action may invade realms heretofore thought immune from interference, if the legislative body sees social harm in what may have theretofore been considered right practice legally, morally, and socially. But, in applying a specific statutory enactment of the type under discussion here, we are not free to disregard the line of demarcation laid down by the courts between governmental action and actions by individuals, and adopt a construction which might turn every base manifestation of local prejudice, bigotry or discrimination, into a federal law suit.

We grant that the acts complained of, the occurrence of which is admitted by the motion to dismiss, inflicted a grievous wrong on the plaintiffs. Such acts are manifestations of that ignoble mob spirit which is so abhorrent to a free, decent and democratic society. They undermine due process and play into the hands of those who would destroy constitutional freedom. For they would substitute for freedom and order in society the momentary whim of an aroused and unruly group. They would substitute for a nation united, a nation divided into Spartans and helots. They would enthrone the mob as arbiter of freedom. And I know of no more unsafe and unworthy repository of the rights of the individual. "Mob law does not become due process of law",[50] by parading under the cloak of fidei defensor.

Notwithstanding this, acts of the character here involved are *not* a foundation for the legal liability sought to be invoked in this case.

It follows that the complaint does not state a claim cognizable in this court.

The motion to dismiss will, therefore, be granted.

---

49 Yankwich, Handbook on California Pleading and Procedure, 1926, Sec. 161.
50 The phrase is that of Mr. Justice Holmes in his dissent, concurred in by

Mr. Justice Hughes, in Frank v. Mangum, 1915, 237 U.S. 309, 347, 35 S.Ct. 582, 595, 59 L.Ed. 969.