John MARSHALL, Appellant,

v.

Grant SAWYER, as Governor of the State of Nevada, et al., Appellees.

No. 17322.

United States Court of Appeals Ninth Circuit.

March 7, 1962.

William B. Beirne, A. L. Wirin, Fred Okrand, Los Angeles, Cal., W. Albert Stewart, Jr., Las Vegas, Nev., for appellant.

Roger D. Foley, Atty. Gen. of Nevada, Bruce R. Thompson, Michael J. Wendell, Sp. Deputy Attys. Gen., for appellees.

Before POPE, HAMLEY and KOELSCH, Circuit Judges.

HAMLEY, Circuit Judge.

John Marshall, having been assertedly ousted from Desert Inn Hotel in Las Vegas, Nevada, brought this action for damages and injunctive relief, invoking the Civil Rights Act, 28 U.S.C.A. § 1343 (1), (3) and (4), and 42 U.S.C.A. §§ 1983 and 1985(3). Named as defendants were the Governor, Gaming Control Board and Gaming Commission of Nevada, the members of the board and commission, D. I. Operating Co., a Nevada corporation which operates the Desert Inn Hotel and five employees of that company. The action was dismissed on the ground that the federal court should abstain and remit plaintiff to his state court remedies. Plaintiff appeals.

It is alleged in the complaint, among other things, that the defendant state agencies and officials entered into an agreement and adopted a policy to discriminate against and to bar plaintiff from registering or obtaining food service, sitting in the lounge or foyer, or being in the casino or on the premises of any hotel in Nevada licensed to operate a gambling casino, and to bar him from the state of Nevada as a person designated by them as "undesirable." It was part of this agreement and policy, plaintiff alleged, that the described objectives would be accomplished by coercion, intimidation and inducement by the state defendants, taking the form of threats against hotels in Nevada that they would lose their casino licenses if appellant were permitted in these hotels.

In order to effectuate this agreement and policy, plaintiff alleged, defendants engaged in the following acts:

1. The board and commission and their members compiled, promulgated, published and issued an 8″ x 10″ booklet bound in black, commonly designated as the "black book," containing the names and pictures of persons, including plaintiff, designated as and deemed, "undesirable" by those defendants, all of this being done without notice or hearing to the persons so designated, including plaintiff;

2. The board and commission and their members on or about March 29, 1960, distributed copies of the black book to hotel operators in the state of Nevada accompanied by a letter over the signature of defendant Abbaticchio, chairman of defendant board, reading in part as follows:

"The attached booklet which will be revised and expanded periodically, contains descriptive data with photographs concerning 11 persons (here they are listed, including appellant).

"In order to avoid the possibility of license revocation for 'unsuitable manner of operation' your immediate co-operation is requested in preventing the presence in any licensed establishment of all 'persons of notorious or unsavory reputation' including the above individuals as well as those who subsequently may be added to this list."

3. The board and commission and their members, personally or through their representatives, orally informed the recipients of the black book and letter

that unless the recipients acceded to the "request" of those defendants, as outlined in the letter, the recipients would lose their licenses;

4. On the evening of October 28, 1960, while plaintiff was sitting in the lounge of the Desert Inn Hotel, not committing or having committed any public offense, Abbaticchio and other representatives of the board and commission, for the purpose of effectuating the described agreement and policy, requested and induced employees of the hotel, defendants herein, to oust plaintiff from the hotel;

5. Acceding to the above-described request and inducement, the five defendants who are employees of the defendant hotel operating company, ousted plaintiff from the hotel premises under threat of physical force, this being accomplished in the presence of a large number of persons;

6. In order to harass and intimidate hotel operators into ousting plaintiff from the Desert Inn Hotel and other hotels in Las Vegas, the board and commission and members thereof, led by Abbaticchio, on the evening of October 28, 1960, and other evenings, confiscated cards and dice in the casinos of various hotels in Las Vegas, including the Desert Inn Hotel, while games were in progress and in full view of public patrons such action being extremely detrimental to the gambling business of these hotels, as the state defendants well know and intended;

7. On or about October 29, 1960, Abbaticchio, having in mind the ouster of plaintiff from the Desert Inn Hotel on the previous evening, publicly stated:

"There has been some failure of certain Strip operators to abide by an agreement with the control board not to entertain or provide or furnish facilities or cater to those people we consider undesirable and detrimental to the gaming industry because of their association with the underworld.

\* \* \* \* \* \*

"We are attempting to get them (the reneging Strip operators) to cooperate with the control board."

8. On or about November 2, 1960, defendant Sawyer, Governor of Nevada, having in mind what had occurred at the Desert Inn Hotel on the evening of October 28, 1960, publicly stated:

"I agree with any measures necessary to keep the hoodlums out of Nevada. The operators have a great responsibility to cooperate.

"We might as well serve notice on underworld characters right now they are not welcome in Nevada and we aren't going to have them here."

Plaintiff sought damages in the amount of $100 from each of the state defendants and in the amount of $150,000 from all of the remaining defendants. The injunction which he sought was one which would restrain and enjoin the state defendants, their agents, employees or anyone acting in concert with them or in their behalf:

"from giving effect to said policy and action of keeping plaintiff out of the State of, and hotels in, Nevada through said Black Book or said letter of March 29, 1960, and from causing, coercing or inducing the operators or employees of hotels in Nevada, by threat of cancellation of license or otherwise, to bar or eject plaintiff from their premises, or to refuse to give service or afford accommodations to plaintiff on the same basis as any other citizen;"

Filed with the complaint was a motion for a preliminary injunction seeking temporary relief of the same kind as that sought in the prayer for a permanent injunction. Defendant D. I. Operating Co., and the five individual defendants who are employees of that company, joined in an answer denying most of the essential allegations of the complaint. The state defendants filed no answer but joined in a motion under Rule 12(b), Federal Rules of Civil Procedure, 28 U.S. C.A., to dismiss the complaint, five grounds being urged, namely: (1) the federal courts should abstain, (2) no grounds for equitable relief were alleged, (3) the complaint did not state a claim upon which relief can be granted,

(4) the complaint shows on its face that each such defendant is protected by the defense of official immunity, and (5) the federal district court lacks jurisdiction.

■ Accompanying the motion to dismiss was the affidavit of defendant Abbaticchio, chairman of defendant board, in which facts were alleged concerning the preparation and issuance of the so-called black book and accompanying letter, and the policies and enforcement methods of that state agency with reference to the regulation of gambling in Nevada. While this affidavit presented matters outside the pleading, it was apparently regarded by the court as directed only to the motion for a temporary injunction, and such new matters were excluded from consideration in passing on the motion to dismiss. The court therefore did not treat the motion as one for a summary judgment, as it would have been obliged to do had the new matters not been excluded from consideration. See Rule 12(b) supra.

As before noted, the motion to dismiss was granted on the sole ground that the district court should abstain. While the non-state defendants had not moved to dismiss the complaint the court also dismissed the complaint as to them. Having held abstention appropriate as to the state defendants, the court determined that the alleged actions of the state and non-state defendants were so intertwined that it would be "ludicrous" to retain the case as to some of the defendants and not as to the others. The non-state defendants have not appeared as appellees in this court.

■■ At the outset we must consider, on our own motion, whether the appeal must be dismissed because not taken from an appealable order. An order which dismisses a complaint without expressly dismissing the action is not, except under special circumstances, an appealable order. Javor v. Brown, 9 Cir., 295 F.2d 60.

The special circumstances which will permit this court to regard such an order as final and appealable must be such as to make it clear that the court determined that the action could not be saved by any amendment of the complaint which the plaintiff could reasonably be expected to make, thereby entitling plaintiff to assume that he had no choice but to stand on his complaint. Asher v. Ruppa, 7 Cir., 173 F.2d 10. See also Gardner v. J. J. Newberry Co., Inc., 9 Cir., 239 F.2d 178; Williams v. Peters, 9 Cir., 233 F.2d 618, 16 Alaska 303.

■ We think such circumstances are present in this case. The order dismissing the complaint herein is not based upon the ground that appellant has failed to state a claim but on the ground that, whether or not a claim has been stated, the federal court should abstain. In view of this ruling there was no way in which plaintiff could, by amending his complaint, avoid dismissal of the action. Faced with this barrier to further district court proceedings, plaintiff's appeal evidences a determination to stand on his complaint and accept the order as a dismissal of the action. We conclude that the order is appealable.

■ Another preliminary question, going to the jurisdiction of the district court to enter the order under review, must also be considered. This question is whether, by reason of the prayer for an injunction restraining and enjoining state officials in certain respects, a single district judge, as distinguished from a three-judge court convened under 28 U.S. C.A. §§ 2281, 2284, had jurisdiction to dismiss the action on the ground of abstention.[1]

1. § 2281 reads as follows:
   "Injunction against enforcement of State statute; three-judge court required
   "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the ap-

This question was not discussed in plaintiff's opening brief on appeal. In the brief filed by the state defendants, it was argued that § 2281 is inapplicable. Plaintiff took the same position in its reply brief. When the question was raised from the bench during oral argument, plaintiff and the state defendants adhered to this position.

Plaintiff, however, filed a post-oral argument memorandum in which a change of view was indicated. It was plaintiff's new position that the case was one for a three-judge court, and if the complaint states a cause of action, the judgment of dismissal should be reversed and the cause remanded for the convening of such a court. Appellees filed an answering memorandum in which they adhered to their previously-stated position that a three-judge court was not required.

█ Section 2281, requiring a three-judge court, is applicable where the plaintiff seeks to enjoin the enforcement, operation or execution of a state statute, or an administrative order of general application representing considered state policy, on the ground that such statute or order is in violation of the Constitution of the United States. See Hatfield v. Bailleaux, 9 Cir., 290 F.2d 632, 635.

In his complaint, summarized above, plaintiff does not attack the validity of any state statute. Nor does he attack the validity of any numbered regulations adopted by the Nevada Gaming Commission.[2] He does, however, in addition to challenging certain conduct by individual defendants, attack the validity of the black book and the letter of March 29, 1960, which accompanied it, compiled, published, distributed and enforced as alleged. While the attack thereon is not expressly stated to be on constitutional grounds, this is the fair intendment of the complaint, as the appellees concede.[3]

The question, then, is whether this black book and the accompanying letter of March 29, 1960, compiled and distributed for the purposes and enforced in the manner alleged, constitute an administrative order of general application representing considered state policy. If so, the single district judge was, in view of §§ 2281 and 2284, without jurisdiction to dismiss the action on the ground of abstention. Idlewild Bon Voyage Liquor

plication therefor is heard and determined by a district court of three judges under section 2284 of this title. June 25, 1948, c. 646, 62 Stat. 968."

The first paragraph of 28 U.S.C.A. § 2284 (5) reads as follows:

"Any one of the three judges of the court may perform all functions, conduct all proceedings except the trial, and enter all orders required or permitted by the rules of civil procedure. A single judge shall not appoint a master or order a reference, or hear and determine any application for an interlocutory injunction or motion to vacate the same, or dismiss the action, or enter a summary or final judgment. The action of a single judge shall be reviewable by the full court at any time before final hearing."

2. Regulation 5.010(3) (e), promulgated by that agency, which is not mentioned in the complaint, reads as follows:

"(3). The commission and the board deem that any activity on the part of a licensee, his agents or employees which is inimicable to the public health, safety, morals, good order and general welfare of the people of the State of Nevada or which would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry is an unsuitable manner of operation. Without limiting the generality of the foregoing, the following acts or omissions may be deemed unsuitable manners of operation:

\* \* \* \* \*

"(e) Catering to, assisting, employing or associating with, either socially or in business affairs, persons of notorious or unsavory reputation or who have extensive police records, or persons who have defied congressional investigative committees or other officially constituted bodies acting on behalf of the United States or any state, or persons who are associated with or support subversive movements."

3. In addition to the allegations of the complaint summarized above, there is quoted in the complaint portions of 28 U.S.C.A., § 1343, in which reference is made to the rights, privileges and immunities secured by the Constitution of the United States.

Corporation v. Rohan, 2 Cir., 289 F.2d 426, 429.

This booklet and accompanying letter have some of the attributes of an administrative order of general application. According to the complaint, the booklet represented state policy and was distributed to all hotels in the state which operate gambling casinos. It was not limited in its effect to a particular and contemporaneous transaction, but extended to future activities at hotels all over the state. It was stated in the accompanying letter that the booklet would be "revised and expanded" periodically, and recipients were advised to give effect to the information therein contained in order to avoid the possibility of license revocation.

However, when the content of the booklet and letter are examined, it is seen that they are only informational and advisory releases without any immediate operative effect as administrative orders. The booklet is limited to a recital of the findings made by the state agencies and officials concerning the alleged undesirable character of identified individuals. Insofar as it is described in the complaint, the booklet does not order licensees to do, or refrain from doing, anything. The letter calls attention to the booklet and requests "cooperation" in excluding the identified individuals from their establishments. Neither the booklet nor the letter were promulgated in the manner prescribed by statute for administrative orders of general application. See N.R.S. § 463.145, 150.

██ Section 2281 is to be closely construed to the end that only those cases which plainly fall in the class therein described be referred to three-judge courts. Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800. An agency determination which is primarily a finding of fact, is not the kind of an order contemplated by § 2281. Ex Parte Williams, 277 U.S. 267, 48 S.Ct. 523, 72 L.Ed. 877.[4]

We hold that the agency action sought to be enjoined in this case does not draw into question the validity of a state regulation or administrative order of the kind referred to in § 2281, and that it was not necessary to convene a three-judge court. The single district judge thus had jurisdiction to entertain the suit.

██ This brings us to the question of whether the court erred in dismissing the action on the ground that the federal court should abstain.

██ The avoidance of the obligation of federal courts to decide cases in which they have jurisdiction can be justified under the doctrine of abstention "only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188–189, 79 S.Ct. 1060, 3 L.Ed. 2d 1163.

The exposing to state construction or limiting interpretation of state statutes fairly open to interpretation, before federal courts are asked to decide upon their constitutionality, has been held to be an important countervailing interest which would be clearly served by abstention. Harrison v. N. A. A. C. P., 360 U.S. 167, 176, 79 S.Ct. 1025, 3 L.Ed.2d 1152. This is true, the court held, because (1) the state courts might give the state statute a construction which would avoid in whole or in part the necessity for federal constitutional adjudication, and (2) if the state adjudication did not moot the federal constitutional adjudication, the federal judgment would at least "be based on something that is a complete product of the State, the enactment as phrased by its legislature and as construed by its highest court; * * *" Harrison, at 178, 79 S.Ct. at 1031.

No such countervailing interest could be served by abstention in the instant case, since the constitutionality of a state statute is not here in issue.

4. See also, Gully v. Interstate Natural Gas Co., 292 U.S. 16, 54 S.Ct. 565, 78 L.Ed. 1088; Martin v. Producers Pipeline Co., 6 Cir., 113 F.2d 817.

What is here in question is the asserted illegality of the conduct of the state and non-state defendants, rather than the validity of the statutes and general regulations under which they may have acted. It is nevertheless true that, were an injunction the only relief sought, abstention would serve the same countervailing interest as in the case of a challenge to the validity of a state statute. A state court might well determine that the conduct complained of was unauthorized by state law and should therefore be enjoined on that ground, without reaching the federal constitutional question.

■ But in this Civil Rights Act case plaintiff seeks damages as well as injunctive relief. The only elements which need to be present in order to establish a claim for damages under the Civil Rights Act are that the conduct complained of was engaged in under color of state law, and that such conduct subjected the plaintiff to the deprivation of rights, privileges, or immunities secured by the Constitution of the United States.

■ The defendants' conduct was engaged in under color of state law if they were clothed with the authority of the state and were purporting to act thereunder, whether or not the conduct complained of was authorized or, indeed, even if it was proscribed by state law. Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492; Screws v. United States, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495. Whether there is "color" of state law is a federal, not a state question. Were this not true a state, acting through its legislature or courts, would have it within its power to immunize its agencies and officials from liability under the Civil Rights Act.[5]

The second essential element in a Civil Rights Act damage case—conduct which deprives the plaintiff of a constitutional right—is also a question of federal law. The meaning or validity of state statutes or regulations is immaterial to the resolution of this question.

■ The abstention doctrine does not permit federal district courts to defer to the state courts for the decision of federal constitutional questions. United States v. Livingston, D.C., 179 F.Supp. 9, 12, affirmed per curiam Livingston v. United States, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719.

It has not been argued that the determination of these federal questions could be avoided by requiring plaintiff to seek damages in the state court on some theory other than the Civil Rights Act. But, in any event, it was held in Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, that the federal remedy provided by the Civil Rights Act is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. "It is no answer," the Supreme Court said, "that the State has a law which if enforced would give relief." See, also, Cohen v. Norris, 9 Cir., 300 F.2d 24.

It follows, from what has been said concerning the damage aspect of this case that abstention could not result in mooting the federal constitutional question concerning the conduct of defendants. Nor would any state court ruling concerning the authority to engage in that conduct be of any assistance to the federal court in deciding the constitutional question. This being the case, abstention would not serve an important countervailing interest. See Public Utilities Commission of Ohio v. United Fuel Gas Co., 317 U.S. 456, 463, 63 S.Ct. 369, 87 L.Ed. 396.[6]

5. The federal character of such a question was exemplified recently in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. The Supreme Court of the United States overturned a ruling by the Supreme Court of Delaware that the conduct engaged in by a particular restaurant did not constitute state action.

6. The district court did not order, and appellees have not suggested, that the case be split, the injunctive feature being dismissed or postponed awaiting a state

We have not overlooked appellees' argument that the damages sought from the eleven state defendants—$100 from each of them—is nominal, and that the principal relief sought is injunctive.

We need not decide whether the $100 sought from each state defendant, if standing alone, should be regarded as a nominal amount. If plaintiff prevails on his damage claim against all of the state defendants, he could recover as much as $1,100. This is a substantial sum. Moreover, while the injunction was sought only against the state defendants, the monetary recovery in the sum of $150,000 sought against all of the remaining defendants cannot be disregarded. Viewing the case as a whole there is no basis for concluding that only nominal damages are sought, or that the principal relief sought is an injunction.

In view of what is said above, it is unnecessary for us to consider whether, if abstention were available here, it was proper to dismiss the action rather than to retain jurisdiction under a stay pending determination of state law questions in state court proceedings, as was required to be done in Harrison v. N. A. A. C. P., supra.

Appellees argue, as an additional ground of affirmance, that the complaint does not state a claim upon which relief can be granted. While this was one ground of the motion, it was not a ground relied upon by the district court in dismissing the action.

A complaint is not subject to dismissal upon this ground unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed. 2d 80; Gruen Watch Co. v. Artists Alliance, 9 Cir., 191 F.2d 700. We are of the view that, except for the question of whether the complaint adequately alleges that the non-state defendants acted under color of state law, the complaint is sufficient to withstand a motion to dismiss made on the indicated ground. Upon remand the parties will have an opportunity to test the adequacy of the complaint in the respect here reserved, and plaintiff will have the opportunity to amend the complaint in that respect.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

POPE, Circuit Judge (concurring).

Notwithstanding I am of the view that the complaint here fails to state a claim, I agree that the case should be remanded for trial and at such trial the facts developed and findings made. In my opinion the issues here are of such vital importance that the principles of sound judicial administration expounded in Kennedy v. Silas Mason Co., 334 U.S. 249, 256, 68 S.Ct. 1031, 92 L.Ed. 1347,[1] and Poller v. Columbia Broadcasting Co., U.S., 82 S.Ct. 486 (Feb. 19, 1962), require that such issues should not be resolved upon a record so limited as this one is. If I were to

court adjudication, and the federal court proceeding with the damage feature of the case.

1. "The short of the matter is that we have an extremely important question, probably affecting all cost-plus-fixed-fee war contractors and many of their employees immediately, and ultimately affecting by a vast sum the cost of fighting the war. No conclusion in such a case should prudently be rested on an indefinite factual foundation. * * * The hearing of contentions as to disputed facts, the sorting of documents to select relevant provisions, ascertain their ultimate form and meaning in the case, the practical construction put on them by the parties and reduction of the mass of conflicting contentions as to fact and inference from facts, is a task primarily for a court of one judge, not for a court of nine.

"We do not hold that in the form the controversy took in the District Court that tribunal lacked power or justification for applying the summary judgment procedure. But summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation, contracting and practice."

base a final judgment upon the complaint alone, read in the light of what I know judicially about the State of Nevada, and its laws, regulations and customs relating to its gambling business, I would be obliged to say that plaintiff is entitled to no relief. But I think the validity of my judgment on that matter can best be tested after all the evidence is in.

Plaintiff is not seeking to defend or enforce any of the commonly recognized rights for the protection of which the Fourteenth Amendment was designed. Involved here is not a right to use the highways as in Morf v. Ingels, D.C., (three-judge case, Cal.) 14 F.Supp. 922, aff. 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653; or public transportation facilities as in Baldwin v. Morgan, 5 Cir., 251 F.2d 780; 5 Cir., 287 F.2d 750; or to hold a job, as in Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131. What this plaintiff asserts is that he cannot be excluded from a gambling establishment. Making such a claim discloses a failure to appreciate the nature and character of Nevada's peculiar institution,—its legalized gambling.

True the gambling casinos are operated by individuals or corporations under state license, but in a very real sense, and in essence, the State of Nevada itself is in the gambling business, and its continued maintenance of that institution is vital to the State's life and its economy. The people of that State could hardly contemplate its loss; indeed there have been indications that they would be prepared to extend their licensing of activities commonly frowned on elsewhere into other fields. For it would appear, from a recent study in this field, that more than half of the state's total public income comes from taxes attributable to the gambling enterprise.[2]

I take judicial notice that Nevada simply cannot afford to lose its gambling business, for its loss would not only affect the tax take,—the loss of employment might be catastrophic,—loss of jobs not only by employees of the gambling casinos themselves but by employees of hotels, restaurants, liquor saloons, and merchandising establishments which would have to fold up when there were no longer gambling crowds to service. As could be expected, the State has gone to great lengths to protect its peculiar institution; and in doing so it has been mindful that he who stirs the devil's broth must needs use a long spoon. For the whole of the State's system of licensing gambling establishments shows its preoccupation with the fear that the wrong kind of people may get control of these enterprises. Thus Nevada statutes provide that it is the policy of the State that all establishments where gambling games are conducted should be licensed and controlled "so as to better protect the public health, safety, morals, good order and general welfare of the inhabitants" of the State, and any license issued to any such establishment is "deemed to be a revocable privilege and no holder thereof shall be deemed to have * * * any vested rights therein or thereunder." Nevada Revised Statutes Sec. 463.130.

The State Gaming Commission and the Control Board are granted "full and absolute power" to deny, suspend or revoke licenses, (Sec. 463.140), and may regulate the games and devices permitted and the "method of operation" of such games. (Sec. 463.150) Express regulations as to "method of operation" proscribe " * * catering to, assisting, employing or associating with, either socially or in business affairs, persons of notorious or unsavory reputation, or who have extensive police records." (Regulation 5.010) In-

2. "The New Gambling King" by Keith Monroe, Harpers Magazine, January, 1962, Vol. 224, No. 1340: "Sparsely populated states are understandably envious of Nevada (second least populous of all) because its state goverment takes in $8 million in taxes on gambling operators, plus $10 million in sales taxes plucked mostly from out-of-state seekers of 'Nevada fun.' This sum pays more than half of Nevada's expenses. Consequently the tax burden of its 285.000 residents is light. To lighten it further, in 1950 the Nevada legislature passed a law legalizing prostitution, but this was vetoed by the governor."

dicating the care taken to screen out questionable characters, Sec. 463.170 provides that no corporation or association may receive a license unless all persons having any direct or indirect interest therein are individually qualified to be licensed.

The opportunities for rich pickings in this sanctuary for gambling would assuredly be tempting to hoodlums and gangsters. At all hazards these enterprises must be preserved for indigenous Nevadans whose law-abiding propensities could be relied upon. Let the gangsters move in from the underworld where they were forced to operate elsewhere, and the resultant crooked games, cheats, frauds, swindles leading inevitably to gangland style kidnapings and killings would mean the end of Nevada's rich gambling take. The good people of the State would not tolerate it, and even if they failed to move, the federal government would be pressured to move in and licensed gambling in Nevada would come to an end with even greater celerity than that which saw the end of polygamy in Utah. The interstate travel aspects of the business would make such federal action simple.[3]

The hazards incident to the State's system of licensed gambling and its policy of excluding from such gambling persons likely to be connected with crime, corruption and criminal enterprises has been expounded by the Supreme Court of the State. Thus in Nevada Tax Commission v. Hicks, 73 Nev. 115, 310 P.2d 852, at 854, the court said: "Throughout this country, then, gambling has necessarily surrounded itself with an aura of crime and corruption. Those in management of this pursuit who have succeeded, have done so not only through a disregard of law, but, in a competitive world, through a superior talent for such disregard and for the corruption of those in public authority.

"For gambling to take its place as a lawful enterprise in Nevada it is not enough that this state has named it lawful. We have but offered it the opportunity for lawful existence. The offer is a risky one, not only for the people of this state, but for the entire nation. Organized crime must not be given refuge here through the legitimatizing of one of its principal sources of income. Nevada gambling, if it is to succeed as a lawful

3. The extent of the facilities provided to carry trade to the Nevada gambling is almost beyond belief. Every day 88 scheduled airplane flights from other states reach Las Vegas. (This does not include the chartered and other non-scheduled flights such as Hacienda's.) Forty-eight daily scheduled plane flights reach Reno. There are as many scheduled flights from Phoenix to Las Vegas as there are from Phoenix to Los Angeles. A few of these flights are subsidized by the gambling industry. See Las Vegas Hacienda, Inc. v. Civil Aeronautics Board, 9 cir., (Jan. 16, 1962), 298 F.2d 430. Hacienda flights are advertised as including "free round trip", "de luxe rooms", "two bottles of champagne", etc., in the yellow pages of the San Francisco telephone book. High speed highways carry automobile traffic from Phoenix, Los Angeles, San Francisco, Sacramento, and elsewhere. All this provides for what may be called the "carriage trade".

But aside from this, the author referred to in footnote 2, supra, notes that with the aid of a well known research institute, a large gambling proprietor developed a rewarding source of customers among these Californians who, not owning cars, yet had spending money. Recruited through an advertising campaign in San Francisco, Sacramento, Stockton and 28 other California cities, these generally low income, often elderly, citizens travel in chartered Greyhound buses, ordinarily 20 loads per day, with average load of 30.2 passengers per bus. According to the report, one-fifth of these passengers had made the trip eight times. As soon as the passenger enters the establishment his fare is refunded him. The author suggests that many of these low income customers shortly wind up on the California relief rolls. "'If we could pay their [Researcher's] fee', said the head of one Salvation Army office, 'we'd be interested to learn just how huge a case load they've added here by helping [the gambling house proprietor] attract people from this town.'"

All that would be required in the way of Congressional action would be an act utilizing the rationale of the Mann Act, 18 U.S.C.A. § 2421 et seq. Compare Public Law 87–228, Sept. 13, 1961, 18 U.S.C.A. § 1952.

enterprise, must be free from the criminal and corruptive taint acquired by gambling beyond our borders. If this is to be accomplished not only must the operation of gambling be carefully controlled, but the character and background of those who would engage in gambling in this state must be carefully scrutinized."

The court there noted that gambling, carried on elsewhere unlawfully, "tends there to create as well as to attract a criminal element." Undoubtedly, this official consciousness of the hazards of gambling attracting a criminal element is based upon experience and a knowledge of local conditions. It seems fair to assume that the necessity for the State to protect itself from the tendency mentioned has led to its statutory requirement that all persons convicted of felony, in Nevada or elsewhere, must register with and be fingerprinted by the police or sheriff. (In Clark County, which contains Las Vegas, and has a population of 127,016, slightly less than that of Fresno, California, 2560 felons registered with the chief of police, or the sheriff during the period January 1, 1961 to February 21, 1962. The number of such felons who registered previously is not available to me.) The autobiography of one of the best known gambling proprietors in the State describes how, years ago racketeers and mobsters operated a gambling establishment, with cribs on the side, how they destroyed another so-called club, and how the author saved his own place when he pulled his gun and threatened to shoot seven hoodlums when they came in to

wreck his place.[4] When the Nevada authorities contemplated the hazards incident to the operation of gambling, it is not surprising that they made membership on the Gaming Control Board a full time job. They may well consider that things need watching when more than two percent of a gambling community's population are ex-convicts.

I have difficulty taking seriously the claim of $150,000 against the hotel for acts which, according to the complaint, came about through "coercion, intimidation and inducement" by the State officials, "by threat of loss of license, upon the hotels of the State." Jurisdiction here is predicated solely upon the Civil Rights Acts, Sections 1983 and 1985(3) of Title 42 U.S.C.A. The first of these sections creates no cause of action against a private individual.[5] The second one (1985(3)), is the one which provides: "If two or more persons in any State or Territory conspire * * * for the purpose of depriving * * * any person * * * of the equal protection of the laws", etc. Liability under this section can arise only where the wrongful acts are done under color of state authority. Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253.[6] But if one or more of the defendants conspiring are state officers, the non-officer defendants may be held. Hoffman v. Halden, 9 Cir., 268 F.2d 280, 298.

The reason I cannot take this $150,000 claim seriously is that I cannot perceive how these private defendants could be said to have conspired to deny plaintiff

4. Harold S. Smith, Sr.: "I Want To Quit Winners", (Prentice-Hall, 1961) pp. 165, 167.

5. Monroe v. Pape, 365 U.S. 167, 175–176, 81 S.Ct. 473, 478, 5 L.Ed.2d 492: "While one * * * scourge of the evil—perhaps the leading one—was the Ku Klux Klan, the remedy created was not a remedy against it or its members but against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law." See also, Kenney v. Hatfield, D.C., 132 F.Supp. 814, affirmed 6 Cir., 232 F.2d 288, 289–

290; Watkins v. Oaklawn Jockey Club, 8 Cir., 183 F.2d 440, 443; Shemaitis v. Froemke, 7 Cir., 189 F.2d 963; Bottone v. Lindsley, 10 Cir., 170 F.2d 705, 706.

6. This case was brought under what is now Title 42, § 1985(3). The decision reversed this court which had reversed Judge Yankwich, 9 Cir., 183 F.2d 308. Judge Yankwich, discussing the action, had stated, (Hardyman v. Collins, D.C., 80 F.Supp. 501, 510): "No cases exist where an action either civil or criminal has been maintained against private persons who interfered with such rights."

equal protection of the law while acting under "coercion, intimidation, and inducement". On the trial it will not take the judge long to decide whether these damages claimed against the private defendants have any basis.

Another aspect of the complaint presents allegations which I think any person familiar with the State of Nevada would know could not be true. This is the claim that by reason of the acts of the defendants "plaintiff cannot stay at a hotel in the State of Nevada", and that defendants undertook to "bar plaintiff from the State of Nevada".

The official action with and concerning the "black book" was not directed to hotels as such. It was directed solely to the purpose of preventing the presence of certain persons "in any licensed establishment". The most that plaintiff can claim is that he was excluded from a gambling establishment. No other interpretation could possibly be placed upon the black book and the statements which accompanied it.[7]

This brings me to the question whether the State of Nevada may validly and constitutionally exclude from the premises where gambling is carried on a person in the position of this plaintiff.

Plaintiff's rights here involved are those which he has by virtue of the Fourteenth Amendment which prohibits the state to deprive any person of life, liberty or property without due process of law and to deny to any person within its jurisdiction the equal protection of the law. It is too elementary to require extended exposition that much of the action taken by a state which is in the exercise of its police power operates to place limitations upon the use of property, the freedom of action of individuals, and the exercise of

rights which the individual may claim in the absence of such legislation.

As stated in Noble State Bank v. Haskell, 219 U.S. 104, 111, 31 S.Ct. 186, 55 L.Ed. 112: "It may be said in a general way that the police power extends to all the great public needs. * * * it may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." And in the exercise of this police power the state may make reasonable classifications of individuals and property so that some are treated differently from others providing of other groups is not necessarily banstantial basis for such classification. Kotch v. Board of Riverport Pilot Com'rs., 330 U.S. 552, 556, 67 S.Ct. 910, 91 L.Ed. 1093: "A law which affects the activities of some groups differently from the way in which it affects the activities of other groups is not necessarily banned by the Fourteenth Amendment. * * * Otherwise, effective regulation in the public interest could not be provided, however essential that regulation might be."

In determining what is state policy, in deciding what purposes of government are to be served by state limitations upon individuals and property, when the state has spoken that is generally the end of the matter because it is within the competence of each state to define its own public purposes. Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27: "Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, wheth-

7. Plaintiff tries to suggest that if the Desert Inn is prohibited from receiving him, then he cannot enter or stay at any hotel; that this means excluding him from the State. It is true that many Nevada hotels, like the Desert Inn, have gambling casinos. Whether, as a matter of Nevada law, they would be regarded as innkeepers, with casinos, or as casinos with room facilities attached, I would not know. But I do know that Nevada is plentifully supplied with convenient and even luxurious motels, many of them having no gambling facilities. That plaintiff could find no place to eat or sleep appears incredible.

er it be Congress legislating concerning the District of Columbia * * * or the States legislating concerning local affairs."

We note here that the exercise of power on behalf of the State of Nevada was accomplished by an act or acts of its Gaming Commission or its Gaming Board with or without the assistance of the Governor. But in a federal court it is of no consequence whether the acts were performed by executive or administrative officers purportedly exercising delegated powers or whether they were done by specific enactments of the legislature itself. Whether the delegation here was proper or not does not concern us;—it is not a federal question. Gundling v. Chicago, 177 U.S. 183, 188, 20 S.Ct. 633, 44 L.Ed. 725; Douglas v. Noble, 261 U.S. 165, 170, 43 S.Ct. 303, 67 L.Ed. 590. See also Lieberman v. Van De Carr, 199 U.S. 552, 562, 563, 26 S.Ct. 144, 50 L.Ed. 305.

Almost without number are the decisions of the courts holding that the Fourteenth Amendment does not prohibit governmental regulation for the public welfare. "Laws passed for the suppression of immorality, in the interest of health, to secure fair trade practices, and to safeguard the interests of depositors in banks, have been found consistent with due process." Nebbia v. New York, 291 U.S. 502, 526, 54 S.Ct. 505, 511, 78 L.Ed. 940, citing in footnotes long lists of decisions of the Court illustrating that proposition. All that is required is that the state's restrictions bear "such a relation to a legitimate object of legislation as to be made the basis of a permitted classification." State of Ohio ex rel. Clarke v. Deckebach, 274 U.S. 392, 396, 47 S.Ct. 630, 631, 71 L.Ed. 1115. "It is also well established that, when a state exerting its recognized authority, undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective. * * * With the wisdom of the exercise of that judgment the court has no concern; and unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended. To hold otherwise would be to substitute judicial opinion of expediency for the will of the legislature,—a notion foreign to our constitutional system." Purity Extract Co. v. Lynch, 226 U.S. 192, 201, 33 S.Ct. 44, 57 L.Ed. 184.[8]

It follows from these considerations that where the anticipated evils, sought to be prevented or restricted, are particularly serious, or where extreme harm may be anticipated, the remedies to be applied may be more drastic if the state authorities reasonably regard such drastic remedies as necessary to protect the state against the anticipated harm. The more serious the threat to the state's welfare, the more drastic the remedy which may be applied.[9]

In the case before us the problem of excluding hoodlums from gambling places in the State of Nevada can well be regarded by the State authorities as a mat-

---

**8.** Olsen v. Nebraska, 313 U.S. 236, 246, 61 S.Ct. 862, 865, 85 L.Ed. 1305: "We are not concerned, however, with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which 'should be left where * * * it was left by the Constitution—to the States and to Congress.'" See in accord, West Coast Hotel Co. v. Parrish, 300 U.S. 379, 399, 57 S.Ct. 578, 81 L.Ed. 703; State of Ohio ex rel. Clark v. Deckebach, supra.

**9.** Illustrations of drastic state action are Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (compelled cutting of all red cedar trees); Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (compulsory sexual sterilization of persons with hereditary insanity); Hadacheck v. [Los Angeles], Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (destruction of large values of brick clay deposits through municipal zoning); Sentell v. New Orleans &c. Railroad Co., 166 U.S. 698, 705, 17 S.Ct. 693, 696, 41 L.Ed. 1169, refers to the holding that "a house may be pulled down or blown up by the public authorities is necessary to avert or stay a general conflagration", and to "the power to kill diseased cattle, to destroy obscene books or pictures, or gambling instruments."

ter almost of life or death. It would be altogether out of place for any court, and particularly a federal court, to say that the State of Nevada could not reasonably anticipate serious and adverse consequences to its peculiar institution if the criminal element is permitted to participate in gambling in its casinos.

When this case is tried, if the legislative facts properly to be considered in passing upon the constitutional validity of the orders here complained of, including some of the matters of which I have here assumed to take judicial notice, are developed for the benefit of the court, I think that the court will have no difficulty in finding that the Gaming Board and the Gaming Commission would apprehend the serious possibility of persons of that character carrying into the establishment loaded dice, marked cards, and other means for cheating or otherwise disrupting the orderly conduct of the licensed gambling. The Board's finding that the mere entry of such a person threatened harm, could not be questioned by the court.[10]

What this case will boil down to in the end is the question whether the State of Nevada may validly exclude convicted felons and ex-convicts from gambling establishments. Plaintiff's complaint states that the basis for his designation as "undesirable" is "the claimed criminal record of plaintiff." The complaint discloses that he had been previously convicted of a felony. It seems too plain to require argument, that a state may validly refuse the privilege of gambling to such a person.

Gambling or being in or about a gambling establishment is a mere matter of governmental favor; it has none of the aspects of property or other private right.

In that respect the gambling casino or any other establishment would stand on no higher plane than that of a business of dealing in liquor for non-beverage purposes which was discussed in Ma-King Products Co. v. Blair, 271 U.S. 479, 46 S.Ct. 544, 70 L.Ed. 1046. In that case the government official refused a permit to operate a plant for denaturing alcohol although the Commission had power to grant such a permit. The Supreme Court quoted with approval language of the Court of Apeals as follows: "The holder of such a permit is entrusted by the government with a power which subjects him to the approaches and bribes of lawbreakers, and where, as in this case, the business associations of applicants have been with men whose conduct has already invited prohibition prosecutions against them, it goes without saying that the Commissioner would have been derelict in duty in granting them a permit." Such a conclusion is so rational and so compelling that it was not even suggested in that case that the complaining parties had been denied any constitutional right.

The complaint is made that the black book was made up without notice or hearing to the persons listed therein. It is unnecessary to consider here whether some of the persons whose names appear in that black book may have been placed there merely because the control board considered them to be persons of bad reputation or known hoodlums or associates of such persons. The decision of this case does not require an inquiry as to whether some such persons might be entitled to notice and hearing before they were placed in an excluded category. Possibly the question of identity, reputation, association with others, would be an appropriate matter for inquiry at a

10. The complaint contains a paragraph alleging that on the evening when plaintiff was excluded from the gambling premises (which plaintiff insists on referring to as "hotel"), the officers confiscated cards and dice. The complaint alleges that this was done to harass and intimidate the hotel operators. If the cards and dice were confiscated, it is a more probable inference that this was done to safeguard against the possible consequences of the plaintiff having been on the gambling premises.

For a reference to a celebrated instance of the development of legislative facts for the court, see Muller v. Oregon, 208 U.S. 412, 419, 28 S.Ct. 324, 52 L.Ed. 551.

hearing. But plaintiff must stand upon his own rights; he cannot attack the constitutionality of the State's action as it affects persons other than himself. "Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party." Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586. See in accord Clark v. Kansas City, 176 U.S. 114, 118, 20 S.Ct. 284, 44 L.Ed. 392; Aikins v. Kingsbury, 247 U.S. 484, 489, 38 S.Ct. 558, 62 L.Ed. 1226.[11]

The placing of this plaintiff's name in the black book list of persons not permitted to enter gambling establishments cannot be questioned on any ground that I can perceive for plaintiff cannot with reason attack a determination that a person convicted of a felony is not permitted to enter a gambling establishment. He is not in a position to contend that he is not such a person for his complaint admits that he is. It cannot be said that in this situation where an admitted ex-convict is about to make himself at home in a gambling establishment, that nothing can be done about excluding him until after service of notice and time fixed for hearing.

It is erroneous to assume that a state may never take action without notice and hearing to persons to be affected. Laws are regularly passed, regulations adopted, without a hearing.[12] In view of the situation of peril which, as we have noted, always surrounds gambling in Nevada, the trial court may well find that plaintiff's entry upon the gambling premises would present an emergency comparable to that presented by an animal running at large while suspected of being afflicted with the foot and mouth disease.

---

11. Plaintiff does not base any claims upon the fact that the "black book" lists but a few persons. I think that circumstance cannot aid him. As stated in Buck v. Bell, supra, (274 U.S. at 208, 47 S.Ct. at 585): "But, it is said, however it might be if this reasoning were applied generally, it fails when it is confined to the small number who are in the institutions named and is not applied to the multitudes outside. It is the usual last resort of constitutional arguments to point out shortcomings of this sort. But the answer is that the law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow. Of course so far as the operations enable those who otherwise must be kept confined to be returned to the world, and thus open the asylum to others, the equality aimed at will be more nearly reached."

12. Suppose a state highway commission causes to be placed on the highway a sign saying: "Tractors with lugs not permitted on the road." As a farmer tries to drive his tractor with lugs on the highway, a patrol officer stops him and prevents his passage. No one would suggest that this action was unlawful because no hearing was had. I find difficulty in concluding that keeping a felon from entering a gambling establishment presents any different situation.